The question is, whether the Act of 1715, c. 48, section 9, is in force, and can be pleaded by heirs to a demand against them for a debt due by their ancestor. It was argued that the Act of 1715, c. 48, section 9, never was intended to embrace in its provision heirs or real estate; that its objects are manifestly executors and administrators and the personal estate, and that this is the case is apparent from the caption of the act, which is entitled "An act concerning proving wills, and granting letters of administration, and to prevent frauds in the management of intestate estates." It is to be observed that the title of a statute is not to be regarded in construing it, because it is no part of the statute (4 Bac. 380), and it can not have escaped the notice of those who are conversant with the frame of our acts of assembly how often a clause of a certain import is ingrafted upon an act respecting a different subject, the clause being suigeneris, totally distinct from and unconnected with the general purview of the act; the clause on that account van not be considered as less valid, and it must be interpreted according to the import of the words used, and so is Bac. Abr. ubi supra, which is a stranger to and unconnected with the purview of the act, it must nevertheless take effect according to its obvious meaning independent of all influence from other parts of the law." The ninth section is in these words: "That creditors of any person deceased shall make their claim within seven years after the death of such debtor, otherwise such creditor shall be for ever barred." This is a general act of limitation, it contains no *Page 16 
exceptions; and it is believed in such a case, where no exception is made in express terms, none can be raised by construction. Creditors shall make their claim: here is no designation as to kind; nothing that points to a division; the expression is general. All. creditors must therefore be comprehended, and the band creditor of course as well as any other; for why should he be excepted? Does not his claim come equally within the spirit and policy of the act, which were the settlement of the estates of deceased persons; the adjustment of the different interests that necessarily arise upon such a change, and accompanying a transfer of rights, with the expediency of terminating all questions respecting them as soon as possible, and the public convenience resulting therefrom in the quiet and repose of society. In reference to these matters, no distinguishing difference can exist between him and any other creditor: An argument is drawn from c. 27, section 5, of this same year, and it is said the. legislature, having the subject of limitation before them, made a general, law, and excepted his case out of it, thereby inferring that it was their intention to except his case out of this act also; but the inference does not hold, the two limitations have different purposes in view; the one turns upon the evidence that establishes the claim, its facility and its certainty; the other regards the repose of society in the preservation of. the existing state of things which, a lapse of time has produced. It is admitted, on both sides, that, under this section, the personal estate is protected, and that the executor may plead the seven years' limitation in bar of the bond creditor; then why should not the real estate be also protected, and the heir be admitted to the same defence? By the common law; the personal estate or the goods and chattels of the debtor, and the profits of the land as they arose, which might be considered as personalty, were only liable to the satisfaction of his debts, the land was *Page 17 
not liable; upon feudal principles it was preserved to the tenant to enable him at all times to perform the duties for which he was answerable to his lord. The creditor, in making the engagement, only looked to the personal estate as his security for the fulfilment of it; and upon the death of the debtor, the onus of payment devolved upon the executor by virtue of the fund of which he was possessed. But if the contract of the debtor had been reduced to a judgment in his lifetime, then by the Statute 12 Ed. I. the lands descended to the heir were bound in his hands for satisfaction, and the half of them in value were by the elegit to be delivered to the creditor to be by him held until the yearly value found by the inquisition taken by the sheriff, upon the oath of good and lawful men, discharged the debt and damages recovered. If, however, the heir was bound in a bond given by the ancestor, and a recovery was had thereon against the heir, the judgment rendered was to be levied of all the land descended to him from his ancestor; and, by the common-law execution which issued in pursuance thereof, the whole of the lands described to the heir and in his hands on the day of obtaining the original writ were delivered to the creditor to be by him held, pursuant to the valuation upon inquisition, until the judgment was satisfied. 2 Plowd. 438, 441, 3 60, 12. Thus stood the law at the time of the passing the Act of 1715. The personal estate was liable, in the hands of the executor or administrator of the debtor, to the satisfaction of all its contracts; the half of the real estate descended in the hands of the heir was liable to the satisfaction of judgment obtained against the ancestor himself, and the whole of the real was liable in the hands of the heir upon a judgment obtained against the heir himself in debt in the debet
and detinet upon the bond of his ancestor. Upon this state of things. I ask again why should not the ninth of c. 48, 1715, extend to heirs as well as executors and *Page 18 
administrators, and its protect ion embrace the one case as well as the other? Both the personal and real representative were liable by virtue of the fund they possessed, and not otherwise, unless by their own default they made themselves so, as by mispleading, rather, if this argument had any bearing at all, it would operate the other way, and press against the point it was intended to support; for at that time, to wit, in 1715, the personal estate was the general fund for the payment of all debts, the real estate a. partial fund for the payment of particular debts only, which were peculiarly circumstanced, if this general fund, then, to which all creditors looked, was shut up by the legislature, may it not be reasonably inferred that those less so were equally within their intention as they are within their words? But it is believed the great principle upon which this limitation turns, and which governed the legislature of 1715 in enacting it, is that laid down by Judge Overton, in the case of Smith against Hickman's Heirs, Cooke, 335; to wit, the peace of society and its preservation. After speaking of the limitation as to the personal estate, he says, "As it respects the situation of heirs, after the death of their ancestors; reasons for limitation also existed. If no lapse of time can secure the estate thus descended the peace of society would be much disturbed. Recoveries might be made of one of many heirs, and suits for contribution must take place. If the legislature deemed it of importance to the peace of society that the time for bringing suits should be limited in the case of proper debts of individuals, surely there is as great reason that heirs should be exempted on that ground from litigation after a certain lapse of time; otherwise they could not know the situation of their affairs. Common prudence would suggest that for some time they would keep their concerns in a compact situation, so as to be able to meet any demand, though unknown at the time of *Page 19 
coming to their patrimonial estate; there surely ought to be some time when this obligation should cease."
To this reasoning of Judge Overton I subscribe. It may be further observed that the twenty-seventh chapter of this same session, enacted by the same legislature, is strongly illustrative of the policy which prevailed at that time, and governed them; it breathes the same spirit as the ninth section of chap. 48, and its enactments tend to the same result to wit, the peace of society. The twenty-seventh chapter of 1715 is a reduction of the statute 21 James I. c. 16; the statute of James limits the right of entry and into lands to twenty years, this act limits the same to seven years. The statute of James limits trespass, detinue, trover, debt, case, c., to six years; this act limits the same to three years. The statute of James limits assault and battery, c., to four years, and actions of slander to two years; this act limits the same, the former to one year and the latter to six months. At and before the passing of this act, the statute of James must have been in force here, the colonists must have brought it with them, adopted it, and acted under it until it was repealed, or its provisions altered by them. The Act of 1715, c. 27, is the alteration they made compared with the statute of James; its policy is manifest: it speaks for itself; while it protects the rights of individuals, it regards the interests of the community, and while it permits redress for the violation of these rights, it consults the public repose and the peace of society in the exertion of it. Upon the whole, therefore, it is my opinion that the ninth section of the forty-eighth chapter of 1715, includes heirs as well as executors and administrators in its words, in its spirit, and in its policy.
The next question is: Does the Act of 1789, c. 23. repeal the Act of 1715, c. 48, section 9, as it regards either heirs or executors and administrators? And, first, as it regards heirs. The Act of 1789, c. 23 is not an *Page 20 
express repeal; it does not say that this ninth section is repealed in terms; much less does it say the whole act is repealed. The repeal, then, of 1715, c. 48, is only express so far as the provisions of 1789, c. 23, are inconsistent with it; and this leads us to a notice of these provisions. It may, however, previously be observed that Judge Iredell, who was employed by the State of North Carolina to revise and publish all such acts as were in force and use, and to leave out all laws repealed and obsolete, as well under the colonial as the State government, has retained this ninth section of 1715, c. 48, in his compilation; this evidences his opinion on this point. Other judges of North Carolina have expressed the same opinion, and such authorities seem to me to been titled to great weight upon this question. Are there any provisions, then, in the Act of 1789, c. 23, inconsistent with this ninth section of 1715, c. 48, as it regard's heirs? None: the word heir is not once mentioned in the act; and all the reasons that concurred in the enacting the Act of 1715, c. 48, section 9, existed in the year 1789, and its policy was rendered more cogent by the intervening Acts of 5 Geo. II., and of October, 1784, c. 11, which subjected the real estate to the payment of all the debts of the indebted ancestor, indiscriminately, that could not be satisfied out of the personal estate. Every reason for the limitation applicable to executors and administrators now since these acts, more strongly applies to heirs; if, after a certain lapse of time, it was thought difficult for the executor and administrator to protect the personal estate, who had the proper vouchers and other documents enabling him to resist the unfounded or the overrated claim which might be exhibited against him, how much more difficult for the heir to resist such claims without these aids; and add to all these the possibility of collusion between a pretended creditor and the executor or administrator, in such a case how is the heir to protect himself after *Page 21 
a great lapse of time? He can not do it. He therefore stands more in need of the protection of 1715 now than he did at the passing of that act, and the public peace would be more disturbed inasmuch as the devices of doing so have been multiplied by the Acts of 5 Geo. II. and 1784. My Lord Coke, in Doctor Foster's case, says that legesposteriores priores contrarias abrogant, but that this contrariety must be in matter, and he adds that it must be known, inasmuch as acts of parliament are established by universal consent for the advancement of the commonwealth, they ought not by any constrained construction, out of the general and ambiguous words of a subsequent statute, to be abrogated, but ought to be maintained and supported with a benign and favorable construction. From this doctrine, evidence of a repeal is not to be. courted, and the intention to do so is to be repelled, unless it necessarily results from the contrariety of matter and produces this consequence that both can not well stand together. My opinion is, they both can well stand together as it respects the heir.
The next question is as it respects the executor or administrator is 1789 a repeal as to him of the seven years' limitation of 1715? All laws and parts of laws that come within the purview of 1789 are expressly repealed by the sixth section. Now to ascertain what comes within the purview of 1789, we must notice the law as it stood before the passing of that act and the alteration produced by it; so that we may perceive what it was the legislature had in view by the Act of 1789, what mischiefs or inconveniences they intended to remedy and provide against. Some of the provisions of 1715 had from time and circumstances become unsuitable to the state of society in 1780: the mode of proving wills and granting letters testamentary and letters of administration, from the increase of population and the extent of territory over which it was spread in 1789, rendered it extremely *Page 22 
inconvenient to have all this business transacted in the secretary's office and general court. The first section of 1789 remedied this by transferring the business from the governor and general or precinct court to the county court where the testator or intestate usually had his residence, a tribunal better adapted to the ease and convenience of the citizens, and better fitted for the correct discharge of those duties from their knowledge of the parties and other circumstances necessary to be taken into consideration, especially in granting letters of administration.
Another mischief in the Act of 1715 was the shortness of the time allowed the executor or administrator to pay the debts of the deceased before he was compelled to deliver over the estate that was unadministered by him to the legatees and distrubtees. This, by Act of 1715, was one year; it was remedied by Act of 1789, section 2, by extending the term to two years.
Another mischief, and one which operated severely upon the executor and administrator, was the continuing his liability to make satisfaction to the creditor and payment of his demand after distribution legally made, and delivering over of the property to the legatee and distributee. It is true he had the power of having bond and security given him to compel the assets to be refunded if necessary before he parted with them; but the law continued him the instrument of affecting this; he was the medium through which the recovery by the creditor was to be had on the one hand, and on the other retribution from the legatee and distributee to satisfy this recovery. This subjected him to much trouble and inconvenience. The act of 1789, sections 2, 3, remedied this by removing from him the latter duties, and imposing them upon the creditor himself. This was affected by taking the bond to refund payable to the chairman of the Court and his successors, instead of the executor and administrator, and giving the process of scire facias thereon to the judgment creditor. *Page 23 
Another object the legislature had in view by the Act of 1789, is introduced by the fourth and fifth sections. By the fourth section they say, all creditors if resident within the State shall in two years, and if out of the State within three years, from the qualification of the executor or administrator exhibit and make demand of their claims of every kind; and, on failure to make demand and bring suit as above, shall be forever debarred of recovery both in law and equity. By the fifth section they say: "In order that all creditors may be duly apprised of the death of the persons indebted to them," executors and administrators shall, within two months after qualification, advertise at the court-house of the county and other places therein; at the district court-house of the next district superior court of law and equity therein, for all persons to bring their demands of every kind to the executor or administrator, agreeably to the directions of this act. Now what is the object the legislature had in view in those two sections? It is the settlement and adjustment of the estates of deceased persons as quickly as possible. To promote this object they address themselves to the parties who will be principally instrumental in accomplishing it. Who in the order of time and the nature of the business is to do the first act? The executor or administrator; to him they say within two months after your qualification you shall advertise, c. For what purpose do they say this shall be done? In order that all creditors may be duly apprised of the death of their debtor; that there is an executor or administrator to whom their accounts and demands of every kind and denomination are to be brought. Who, in the like order of time and nature of business, is to do the next act? The creditor, of course. To him they say, Within two years, if your residence is within the State, and if not, within three years from the qualification of the executor or administrator, you shall exhibit and make demand of your debts and claims of *Page 24 
every kind; and if you fail to demand and bring suit, you shall be forever barred. From these sections, taken together, it seems to me that the Legislature could not intend the bar to operate unless advertisement was made. If advertisement is not made, the creditor pursues his remedy as before these sections were made; that is, he may bring his suit at any time within seven years after the death of the debtor, pursuant to the third section of chapter 48 of 1715. If the creditor brings suit after the two years in section 2d of 1789. the executor or administrator may plead fully administered, and if found for him, the creditor is turned over upon the legatees and distributees, or both, as the case may be, by virtue of the same second section and third section, and has his recovery satisfied by them upon process of scire facias. But it was argued at the bar that this fourth section was intended for the benefit of legatees and distributees; that the limitation of two years and three years is for the benefit of some one that the executor or administrator needs it not, for he is protected by the bond and the plea of fully administered; it must therefore be for the benefit of the legatee and distributee to quiet them upon their bond, and discharge them from liability to creditors, if their claims were not brought within the two years or three years. As was noticed before, the situation of the executor and administrator is much meliorated; by the provisions of the second section he is discharged from much trouble by the bond being payable to the chairman, and then scire facias thereon, but he had no risk to run before this; the bond was taken personally to himself, and he had the power of good security; if he did not take it, it was his own fault; his protection is not increased, but his convenience is consulted. It is true a benefit is given by this fourth section to legatees and distributees, but it is incidental only, and consequential upon a bar being effected. Neither the bar nor the consequent benefit to legatees and distributees *Page 25 
is the primary object of the Legislature; but the speedy settlement of deceased persons estates is, and these occasionally result as accidents in accomplishing the main object. It results to them as a penalty or a forfeiture of the creditor for his misconduct in not obeying the requisitions of the law, and in proportion as he loses they gain. But this benefit they have upon terms, and it does not follow that they are to have it, at all events, whether these terms are complied with or not. By no means; this would be extending a benefit to legatees and distributees, beyond the law and the reason of it, to the manifest injury of the creditor. The fifth section says: "In order that all creditors may be duly apprised,"c., "advertisements shall be made," c. Does not this evince it to be the clear intention of the Legislature that these are the terms upon which the strong measure of the fourth section should be enforced upon creditors. Advertisement is to be made; for what? That all creditors may be duly apprised of the death of the debtor, and so be enabled to bring suit and avoid the bar; ergo, it follows, as a consequence, no notice no bar. To construe the fifth section as merely directory would render it nugatory to the creditor; it might as well not have been enacted at all as to him, to say it shall be observed, and not make its observance operate as a condition precedent. It is said this construction is placing the legatee and distributee in the power of the executor and administrator. To this it is answered, the other construction has worse effects; it is placing the creditor in the power of the executor and legatee, of the administrator and distributee, and by their collusion operates in transferring the debt of the creditor to the legatee, by so much augmenting the fund that ultimately goes to the latter. Now which ought to be thus placed — the legatee and distributee, or the creditor? The executor and legatee, the administrator and distributee, are the representatives of the same person *Page 26 
with regard to the same fund; the creditor is a stranger; his claim is adverse, and in the eye of the law more favored. But to put such a construction upon this act as would place the claim of a legatee or distributee in a more favored point of view than the claim of a creditor, would be a violence upon every legal principle, which always prefers the latter claim to that of the former, and directs its first and prior satisfaction; and then, and not before this satisfaction is made, is the right or claim of the legatee or distributee at all acknowledged.
But again, it is argued that this act is inconsistent with the Act of 1715 inasmuch as by this act a bar of two years and) of three years is given by the fourth section, then the bar of seven years is not necessary to effect what is already effected. This would be the case were the bar of 1789 not conditional and dependent on the advertisement; but I think the plain object and fair meaning of the fourth and fifth sections of the Act of 1789, taken together, is the introduction of a new limitation upon terms. If these terms are complied with, the fund is protected by the second and third years' limitation from the creditor; if not complied with, then only protected by the old limitation of seven years. These two limitations are not inconsistent; they may well stand together within the reason of the act. If the party has given publicity to the death of the debtor, and of his own situation of being answerable to the creditor, and brings this knowledge home to the creditor by showing a legal and effectual advertisement, as prescribed by the fifth section, he shall be barred. But is it reasonable that the want of this knowledge, which depends upon the act of the party opposed to the claim of the creditor, shall oust the creditor of his former remedy, and of rights not given by this act, and not dependent upon its provisions? Such consequences can not be either within the act or within the reason of it. *Page 27 
But an argument has been drawn from the exception in the Act of 1789 in favor of infancy, coverture, c., to show that the Act of 1715 is not in force; for it is said that, if the disability is not removed until after seven years from the death of the testator or intestate, and the Act of 1715 is to prevail and be a bar, then the Act of 1789 is rendered inoperative and the exception nugatory. If the exception is to prevail, then the Act of 1715 is no bar. This is an extreme case, and by possibility may exist; but every case can not be embraced and provided for. although coming within the same apparent mischief. It has been universally admitted that a positive bar is enacted by 1715, c. 48, section 9, without any exceptions whatever: this is by a period of seven years. This period the Legislature fixed upon as the most suitable to answer the purpose intended by them to rest the repose of the country; beyond this period, public convenience says claims by suit shall not be entertained by the tribunals of the country; if earlier application is not made, public policy says they shall not after that be sustained; that, after this period, it is better for particular situations, as infancy, coverture, c., to suffer than the general repose of the whole country. But because the general policy of the country must prevail, it does not follow that this is oppugned by the Act of 1780. These exceptions may be still operative to a certain extent, and when not set in opposition to this public policy; neither do I think the Legislature of North Carolina ever intended such an opposition. When may they operate? Whenever the limitations of 1789 have attached, and that of 1715 has not; that is, during four or five years, according to the case. Suppose the disability, is removed one day after the limitation of the two or three years of 1789, and the requisites of advertisement have been complied with by the executor or administrator, a bar is. then effected; but the exception *Page 28 
sustains the action against the enactment of the fourth section of 1789 of two and three years; and this it will do to any suit brought thereafter for the space of one year. So if the disability is removed at some after period, as in five or six years after the qualification and within seven years from the death, the exception is sustained by the provision against the enactment of the fourth section.
Thus, in all these cases, there is an operation for the exceptions of 1789 without interfering with the public policy of the country declared in 1715 and both laws can well stand together and be consistent with each other; and this is giving a privilege to infants, feme coverts, c., not given to the mass of the citizens, and extending to them a relief in consequence of their disability as far as is consistent. with public policy and no farther. This farthest limit is prescribed by 1715, c. 48, section 9. In support of this construction, I will here quote the reasoning of the judges upon the statute of fines in the case of Stowel v. Zanch. They say, where an act of parliament limits a time for the public repose of the realm, in order to avoid universal trouble to the subjects of the realm, such time ought to be peremptory, and ought not either by exposition or equity to be favored and enlarged for an infant or any other beyond the strict extent of the words: for the public repose is more to be regarded than the private convenience of any particular person, whether he be an infant, or of unsound mind, or any other degree. Plowd., 372.
But judgment was given according to the opinion of the other two judges.